IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| MICHAEL R. REINACHER, <br><br> Plaintiff, <br><br> vs. <br><br> ALTON & SOUTHERN RAILWAY COMPANY, <br><br> Defendant. | Case No. 14-cv-01353-JPG-DGW |

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

The Court conducted a bench trial in this matter on May 23 and 24, 2016, in Benton, Illinois. The Plaintiff, Michael R. Reinacher, was present and represented by Lee W. Barron. The Defendant, Alton & Southern Railway Company ("A&S"), was present through its employee, Richard Wulff, and was represented by Clifford A. Godiner and S. Cody Reinberg.

Plaintiff called as witnesses in his case in chief: Alice Reinacher, Gary Reinacher, Andrew William Brier, and himself. The Defendant called as witnesses in its case in chief: Michael McCarthy, Matthew Fisher, Mario Rupert, Dr. John Paul Holland, Dr. Jesse Taber, Dr. R. Edward Hogan (by deposition), Dr. Ghazala Hayat (by deposition), and Richard Wulff. The parties jointly submitted the testimonies of Dr. Dolores Cantrell, Dr. Syed Ali, and Amy Bang by deposition.

**I. Background[1].**

This action arises under the Americans with Disabilities Act ("ADA")(42 U.S.C. 12101, *et. seq*.). Plaintiff became employed by the defendant in August 2003, as a "carman." In 2008,

---

[1] Background information taken from the Plaintiff's Complaint (Doc. 1); Defendant's Motion for Partial Summary Judgment (Doc. 27); Plaintiff's Opposition (Doc. 32) to Defendant's Motion for Partial Summary Judgment, and the Final Pretrial Order (Doc. 54).

plaintiff began having "seizure or seizure-like" symptoms. The parties agree that the plaintiff had a seizure in 2008 and one in 2009; however, the parties disagree on the third "loss of consciousness event" in July 2011. According to the defendant, this event was also a seizure and according to the plaintiff, the event was "characterized by some physicians as heat stroke and others have called it a possible or probable seizure." There were no injuries as a result of these three events. Plaintiff was diagnosed as having epilepsy on November 16, 2009, and was placed on anti-seizure medication. According to the Plaintiff, he has not had a seizure since the 2011 event.

After the 2008 and 2009 events, the plaintiff was allowed to return to work without restriction after approximately six months of medical leave. However, after the 2011 event, the plaintiff was placed on a medical leave of absence and was required to undergo a fitness for duty examination by defendant's medical officer – Dr. John Holland. Dr. Holland placed restrictions on the Plaintiff that made it impossible for the plaintiff to perform the job of a carman.

Plaintiff's personal physician, Dr. Dolores Cantrell, provided correspondence that the plaintiff could return to work in January 2012. She sent follow-up correspondence on January 23, 2012, and November 14, 2012, that the plaintiff was released to full duty with no restrictions. Neurologist Dr. Ali issued a letter on November 20, 2014, that Plaintiff could return to work with no restriction. These letters were provided to the defendant, but the complaint indicates that, "since at least January 4, 2012," the defendant has not "provided the plaintiff with any work assignments or opportunities for earing income."

The Court granted partial summary judgment on the Plaintiff's claims for retaliation, failure to accommodate, and disparate impact. Those claims were dismissed with prejudice.

Therefore, the sole claim that was tried was one count of violation of the ADA alleging that A&S discriminated against the plaintiff for his seizure disorder.

The defendant presented a "direct threat" defense and the defense that it was entitled to rely on Dr. Holland's opinion that the plaintiff could not safely perform the job of a carman. The defendant also argued, if discrimination was found by the court, that the plaintiff failed to mitigate his damages.

## II. Findings of Fact.

The Court finds the following facts by a preponderance of the evidence:

1. Plaintiff became employed by the defendant in August 2003.
2. Plaintiff was employed by the defendant as a "carman."
3. The job of "carman" involves the inspecting and repairing of railroad cars.
4. The inspecting and repairing of railroad cars involves the use of machinery such cranes, welders, forklifts, and car movers.[2]
5. The inspecting and repairing of railroad cars requires a "carman" to work in and around live tracks.[3]
6. A carman's job is dangerous given the fact that the work involves machinery and working in and around live tracks.
7. An individual losing consciousness at work as a carman poses a high risk of serious injury or death to himself, his co-workers, and the general public.
8. Plaintiff adequately performed his job duties without restrictions prior to his first seizure on January 21, 2008.
9. On January 21, 2008, Plaintiff had a seizure that did not occur during working hours.

---

[2] Car movers are a piece of equipment that moves train cars from one location to another along the tracks.
[3] "Live tracks" are those tracks that are not locked down and may have moving trains running on them. A "blue-flagged" track is a track that is locked down and not permitted to have trains move on it.

10. Plaintiff was placed on a medical leave of absence for approximately six months and then permitted to return to work without restrictions pursuant to defendant's company policy.

11. Plaintiff adequately performed his job duties without restrictions from July 2008 until November 2009, the date of his second seizure.

12. On November 15, 2009, Plaintiff had a second seizure while leaving work that resulted in a motor vehicle accident.

13. The motor vehicle accident occurred when the plaintiff had a seizure while driving his personally owned vehicle.  The seizure caused the plaintiff's right foot to bear down on the accelerator.   The vehicle was brought to a stop by a passenger in the plaintiff's vehicle.

14. Plaintiff was again placed on a medical leave of absence for approximately six months.

15. Dr. John Charbonneau, one of Defendant's associate medical directors, reviewed plaintiff's medical records, including the plaintiff's doctor's release, and permitted the plaintiff to return to work with a requirement to follow up with his neurologist every three months.

16. Plaintiff returned to work in June 2010, without restrictions pursuant to defendant's company policy.

17. Plaintiff provided his first three month follow-up note to Dr. John Holland, who recommended that the plaintiff be allowed to continue working without restrictions.

18. At this time, Dr. Holland believed that the plaintiff had only the single 2009 seizure and was not aware of the 2008 seizure.

19. The Defendant's general policy in 2009 was that if an employee had a single incident seizure, the employee was required to be off work for six months and under the care of a

neurologist. After six months, if the neurologist stated that the employee was stable and able to return to work, the defendant would allow the employee back to work without restrictions, but under a monitoring program.

20. The Plaintiff was diagnosed with epilepsy on November 16th, 2009.

21. Epilepsy affects the neurological functions of the brain resulting in seizures.

22. There is no cure for epilepsy, but anti-seizure medication can bring epilepsy under control and reduce the risk of seizures.

23. The Plaintiff began taking anti-seizure medication after the November 2009 seizure and continues to take an anti-seizure medication to date.

24. Seizures are not predictable and there is always a chance of having a "break through" seizure even while on medication.

25. Plaintiff adequately performed his job duties without restrictions from June 2010 until July 2011.

26. On July 2, 2011, the Plaintiff had a fight with his girlfriend, he got very little sleep, and he forgot to take his anti-seizure medication prior to coming to work on July 3, 2011.

27. On July 3, 2011, the Plaintiff started to feel really hot while working. He wasn't feeling well, so left the railroad yard and entered the break room to obtain water and cool off. The Plaintiff then had a third "loss of consciousness" event.

28. Plaintiff was taken to the St. Louis University Hospital and released to return to work by the emergency room doctors on July 5th, 2011.

29. Dr. Cantrell, Dr. Taber, Dr. Hayat, and the plaintiff testified that the failure to take anti-seizure medication, fever/illness, and the lack of sleep can trigger seizures.

30. The doctors who have reviewed the July 3, 2011, event have discussed whether the event was a loss of consciousness due to excessive heat or whether it was a seizure. Dr.Cantrell stated it was 50/50 whether it was a seizure; Dr. Hayat state probable generalized tonic-clonic seizure ("GTC"); Dr. Hogan stated possible partial epileptic seizure without secondary generalization, but that it may or may not have been a seizure; Dr. Tober stated probable seizure; Dr. Hayat stated probable GTC seizure; and Dr. Holland stated it was more probably than not a third seizure.

31. The Court finds by a preponderance of the evidence that the July 3, 2011 "loss of consciousness" event was a seizure based on the plaintiff's history of prior seizures, that the plaintiff forgot to take his anti-seizure medication, and the plaintiff's lack of sleep the evening prior to the event.

32. Plaintiff was placed on a medical leave of absence after the July 3, 2011 seizure and has not been permitted to return to work.

33. Plaintiff experienced a loss consciousness during each of the three seizures.

34. A loss of consciousness substantially limits all of the major life activities, including the ability to speak, walk, eat, dress, etc.

35. Doctor Cantrell advised that the Plaintiff could return to "full duty" on January 4, 2012 which was six months after the July 3, 2011 seizure[4].

36. Dr. Cantrell's opinion that the plaintiff could return to work six months after the July 2011 event was not supported by any medical literature, but was based on the fact that the defendant allowed the plaintiff back to work after six months in 2008 and 2009.

37. Dr. Cantrell testified that she would have applied commercial motor vehicle standards to the plaintiff if she had been aware that he drove forklifts or gators[5] as part of his job.

---

[4] As stated previously, Dr. Cantrell's opinion was that it was 50/50 whether it was a seizure or heat exhaustion.

38. The Defendant's Chief Medical Officer, Dr. John Holland, conducted a review of the Plaintiff's medical history after the July 3, 2011 seizure and placed the plaintiff on following permanent work restrictions:

    a. Not to operate company vehicles, mobile or on-track equipment (such as, car movers), fork lift, cranes or hazardous machinery.
    b. Not to work around live/active tracks.
    c. Not to work at unprotected heights over 3 feet off the ground (note: he should not work on top of rail cars or do other jobs that require use of fall protection devices).
    d. Not to operate welding equipment or cutting torches.
    e. Not to work in confined spaces (as defined in OSHA regulations.)

39. Dr. Holland did not physically examine the plaintiff.

40. Dr. Holland based his determination with regard to the restrictions on his review of plaintiff's medical records (to include plaintiff's treating physicians' records and recommendations and emergency room records), plaintiff's job duties and the potential safety risks related to plaintiff's job duties, and medical literature including the Federal Motor Carriers Safety Administration seizure studies; the FIRST seizure study; the Multicentre Epilepsy and Single Seizure Study; and the studies by Hauser, Dr. Berg, and Dr. Krumholz.

41. Dr. Holland testified that there is a 64 percent[6] chance of having a third seizure within the next five years for an individual who had two prior seizures. There is a 76 percent chance of having a fourth seizure within the next five years for an individual who had three prior seizures.

---

[5] Dr. Cantrell stated that a gator was like a "four-wheeler car" which the court will assume she is referring to an all-terrain type vehicle.
[6] Cumulative risk without anti-seizure medications.

42. Dr. Taber testified that an individual seizure free while off medication for 10 years still has a one percent per year risk of seizure.

43. Based on Dr. Holland's testimony, the Court finds that the plaintiff had a 76 percent chance of having a fourth seizure within five years after the July 2011 seizure.

44. Based on Dr. Taber's testimony, the Court finds that an individual who is seizure free while off medication for 10 years still has a one percent per year risk of seizure.

45. Also based on Dr. Taber's testimony, the Court finds that 70% of individuals with epilepsy become seizure free on anti-seizure medication.

46. Plaintiff was informed of the permanent restrictions which effectively prevented him from returning to work as a carman on December 8, 2011.

47. Defendant continued plaintiff's employment status as being on a medical leave of absence.

48. Plaintiff filed a grievance with his union.

49. There was no testimony with regard to the outcome of the union grievance other than, "[i]t didn't go anywhere."

50. Plaintiff filed a Charge of Discrimination with the EEOC[7] on August 27, 2012, stating that he had been placed on permanent restrictions and not permitted to return to work even though his doctor had cleared him for work without restrictions.

51. The Court finds that placing permanent restrictions on the plaintiff so that he was unable to perform the position of a carman was an adverse employment action.

52. The Court finds that the date of the adverse employment action occurred on December 8, 2011, when the defendant informed the plaintiff of the permanent work restrictions which prohibited the plaintiff from ever performing the job of carman.

---

[7] Equal Employment Opportunity Commission.

53. Based on the finding that the adverse employment action occurred on December 8, 2011, the Court further finds that no continuing violation occurred– up to and including the date of trial.

54. The Court further finds the testimony of Dr. Holland creditable and the restrictions reasonable in light of plaintiff's three seizures which resulted in loss of consciousness and the testimony which indicated the potential risk that the plaintiff had a 76 percent change of another seizure within five years of the 2011 seizure.

55. Defendant has never terminated the plaintiff's employment and the Plaintiff is still characterized as an employee of the defendant.

56. No one representing the Defendant has ever informed the Plaintiff that he can never return to work.

57. Plaintiff has not performed any work for the defendant since July 3, 2011.

58. Plaintiff has requested to return to work, but has not been permitted to do so.

59. All subsequent evidence beyond December 8, 2011, is irrelevant and will not be considered by the Court based on the finding that the adverse employment action occurred on December 8, 2011.

### III.  Conclusions of Law.

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 12101, *et seq.*

The ADA prohibits an employer from discriminating against a "qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

In order to prove disability discrimination, the plaintiff was required to prove at trial that he is disabled within the meaning of the ADA, qualified to perform the essential functions of his job, with or without reasonable accommodations, and that he suffered from an adverse employment decision because of his disability. *See Hoppe v. Lewis University*, 692 F.3d 833, 838-839 (7th Cir. 2012); *Bekker v. Humana Health Plan, Inc.*, 229 F.3d 662, 669-670 (7th Cir. 2000).

A.  Disabled within the meaning of the ADA.

To be disabled within the meaning of the ADA, the plaintiff was required to present evidence that he (1) has a 'physical or mental impairment that substantially limits one or more of the major life activities; (2) has a record of such impairment; or (3) is regarding as having such impairment. 42 U.S.C.A. 12102(1). "'If an ADA plaintiff establishes a prima facie case, the burden shifts to the employer to offer a legitimate nondiscriminatory reason for the employment decision.'" *Hoppe v. Lewis University,* 692 F.3d 833, 839 (7th Cir. 2012)(quoting *Nese v. Julian Nordic Const. Co.*, 405 F.3d 638, 641 (7th Cir. 2005)).

The ADA requires, "an individualized assessment of each plaintiff's 'actual condition,' rather than a 'determination based on general information about how an uncorrected impairment usually affects individuals.'" *Branham v. Snow*, 392 F.3d 896, 903 (7th Cir. 2004)(quoting *Sutton,* 527 U.S. at 483, 119 S.Ct. 2139.) Further, "[t]he determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures" and that, "[a]n impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active." 29 C.F.R. § 1630.2(j)(1)(vi)(vii).

Plaintiff was diagnosed with epilepsy on November 16th, 2009. Epilepsy affects the neurological functions of the brain resulting in seizures. Given the inherent nature of epilepsy, it is considered, "virtually always to be found to impose a substantial limitation on a major life activity." 29 C.F.R. § 1630.2(j)(3)(iii). Seizures are not predictable. There is always a chance of having a "break through" seizure even while on medication and failure to take anti-seizure medication, fever, and/or the lack of sleep can trigger seizures. The plaintiff experienced a seizure on January 21, 2008; November 15, 2009; and July 3, 2011.

During each of the three seizures, the plaintiff experienced a loss of consciousness which substantially limited all major life activities, including the ability to walk, eat, communicate, and/or comprehend his surroundings. Since a seizure can occur at any time and substantially impairs all major life activities, the plaintiff is disabled within the meaning of the ADA.

The plaintiff argued that the defendant did not make an individual assessment of the plaintiff, but the Court does not agree. Plaintiff's medical records along with his treating physician's recommendations were reviewed along with the specific job prerequisites of a carman. The Seventh Circuit has held that, "[t]he lack of an examination" does not render a doctor's testimony inadmissible. *Walker v. Soo Line R. Co.*, 208 F.3d 581, 591 (7th Cir. 2000). Dr. Holland did not solely rely on statistical data of individuals with epilepsy, but evaluated the medical data concerning the risk of seizure recurrence for the plaintiff based on plaintiff's individual medical history.

Plaintiff also argued that the defendant did not present any evidence that defendant's prior policy of allowing the plaintiff to return to work after six months after a seizure was ineffective or cause harm to any individual. But there is no requirement for the defendant to justify prior policy. The defendant was only required to present sufficient evidence at trial that,

at the time it placed the plaintiff on the permanent restrictions, the assessment of risk was based on medical or other objective evidence and that there existed an objectively reasonable significant risk[8]. *Branham v. Snow*, 392 F.3d 896, 906 (7th Cir. 2004).

### B. Qualified to perform the essential functions of his job.

"To determine whether a disabled person is qualified, this court considers whether he can perform the essential functions of his job at the time the employer makes the allegedly discriminatory employment decisions." *Ammons v. Armark Uniform Services*, 368 F.3d 809, 818 (7th Cir. 2004). "Her ability to come to work, or to otherwise perform the essential functions of her job, is examined as of the time of the adverse employment decision at issue." *Basden v. Professional Transportation, Inc.*, 714 F.3d 1034, 1037 (7th Cir. 2013).

"Moreover, because the decision not to reverse an adverse employment decision is not a fresh act of discrimination, an employee cannot toll the limitations period by pursuing grievance proceedings." *Williamson v. Indian University*, 345 F.3d 459, 463 (7th Cir. 2003). "[N]either appeals nor a deferred final date of employment postpone the time within which the employee must make a charge." *Lever v. Northwestern University*, 979 F.2d 552, 553 (7th Cir. 1992). Both cases referred to the tolling of time to file a charge with the EEOC which is a perquisite to filing an ADA claim. The plaintiff argued that there was "continuing discrimination" for the years that the plaintiff requested, but was denied work. However, Plaintiff's repeated efforts to have the restrictions lifted did not amount to "fresh acts" of discrimination or to continuing discrimination. Further, the "continuing violation" doctrine is "limited to claims of hostile work

---

[8] Plaintiff cites to *Shelton v. City of Cincinnati*, 2012 WL 5385601 (S.D. Ohio Nov. 1, 2012) and *Stragapede v. City of Evanston*, 125 F.Supp.3d 818 (N.D. Il 2015) – both non-controlling precedent – with regard to "significant risk." The *Stragapede* case cites to *Branham v. Snow*, 392 F.3d 896 (7th Cir. 2004). As *Branham* is controlling precedent, the Court considered the reasoning of *Shelton* or *Stragapede*, but relied on *Branham* standards with regard to "significant risk."

environment" and there were no allegations of a hostile work environment at trial. *Barrett v. Ill. Dept. of Corrections*, 803 F.3d 893, 898 (7th Cir. 2015).

"When the discriminatory act occurs, no less than whether a given act was discriminatory, is a question of fact." *Lever v. Northwestern University*, 979 F.2d 552, 553 (7th Cir. 1992). The Court has found that the adverse employment event took place on December 8, 2011. The date of the adverse employment action will be discussed in further detail below.

"The term 'qualification standards' may include a requirement that an individual shall not pose a direct threat to the health or safety of other individuals in the workplace." 42 U.S.C § 12113(b). This provision is commonly referred to as the "direct threat" defense.

Defendant A&S had the burden of proof at trial with regard to the "direct threat" defense and was required to demonstrate that the plaintiff was a direct threat to the safety of himself or others at the workplace that reasonable accommodations could not eliminate. *Branham v. Snow,* 392 F.3d 896, 906 (7th Cir. 2004).

The "direct threat" defense requires, "an individualized assessment, based on reasonable medical judgment, of an employee's present ability to safely perform the essential functions of his job. Among the factors to be considered are:

    (1) The duration of the risk posed by the employee's condition;

    (2) The nature and severity of the potential harm that might result;

    (3) The likelihood that the potential harm will occur; and

    (4) The imminence of the potential harm."

*Felix v. Wis. Dept. of Transportation*, No. 15-2047, 2016 WL 3618299, at *7 (7th Cir. July 6, 2016).

In this case, the duration of the risk posed by the plaintiff's condition is indefinite[9]. There is no known cure for epilepsy. Although medication can bring epilepsy under control and reduce the risk of seizures, there is always the potential for a break-out seizure. The longer an individual goes without a seizure reduces the risk of future seizures, but it does not completely eliminate the risk. According to the medical testimony of Dr. Taber, an individual seizure free while off medication for 10 years still has a one percent per year risk of seizure.

Dr. Taber also testified that 70% of individuals with epilepsy will become seizure free on anti-seizure medication. The plaintiff argued that he is in the 70% group and that any risk is eliminated as long as the plaintiff maintains his medication. Plaintiff's 2011 seizure indicates otherwise. Plaintiff was on anti-seizure medication when the 2011 seizure occurred – although he had not taken his medication that day. Plaintiff had the responsibility to ensure his daily medication and failed to do so. There are also triggers that the plaintiff has no control over such as a fever or infection. The plaintiff had three seizures within three years and a 76 percent chance of having a fourth seizure within five years – even without triggers. Therefore, the Court finds that an objectively reasonable significant risk existed at the time of the adverse employment decision.

If the plaintiff experienced a seizure while operating equipment or working around a live track, the nature and severity of the harm that might result would be the high risk of serious injury or death to himself, a co-worker or the general public. The plaintiff argued that these risks are speculative and that many day-to-day activities pose risks - such as driving a car – and the Court agrees to an extent. If the Court were to research the risk of death or injury while

---

[9] Plaintiff cites to *EEOC v. Rexnord Industries,* 966 F.Supp.2d 829, 829 (E.D. Wis. 2013), which is non-controlling precedent for the position that, "courts have considered the length of the seizure itself, among other things in determining the duration of the risk." Although non-controlling, the Court considered the reasoning of the case and determined that the duration of the seizures were not relevant as the risks associated with the plaintiff's seizures are immediate regardless of the duration of the seizure.

driving a vehicle, it may find that the risk is substantially higher than the current risk of the plaintiff experiencing another seizure. The plaintiff also argued that the risk of serious injury or death is an inherent part of working with and around live tracks and trains. The Court also agrees that there is an inherent risk in all safety-critical jobs such as a carman, airline pilots, and commercial drivers. However, just as there are many medical conditions that will revoke an individual's license to drive, safety-critical jobs require an employer to minimize potential risks to ensure the safety of all employees and the general public.

What would be an acceptable amount of risk for a safety-critical job? According to the FMCSA[10] and the defendant, the appropriate amount of risk is a 1% recurrence threshold for safety-critical positions. Although the duration of the risk posed by the plaintiff's condition is indefinite and the risk is never eliminated, it does reduce over time.

During the 2011 seizure, plaintiff had a vehicle accident that was only brought under control by the passenger in his vehicle. If the seizure had occurred when the plaintiff was on a fork lift and the plaintiff foot seized on the gas pedal, the fork lift could have pierced a train car containing hazardous or flammable chemicals, it could have stuck a co-worker, or it could have come into the path of a moving train. Even if the plaintiff was not operating equipment, there would be a significant risk of the plaintiff being harmed by the numerous moving trains if he lost consciousness. The Court has considered the evidence that plaintiff experienced the 2011 seizure while at work and was able to seek the safety of the break room prior to losing consciousness. However, he may not always be able to do so and the likelihood that the potential harm will occur remains high given the work environment of a carman.

---

[10] There was evidence that the FMCSA will grant an exemption to drivers who have epilepsy and are on anti-seizure medication, but the exact protocol and requirements were not submitted into evidence. Also, the FMCSA medical panel recommended the annual seizure risk threshold be increased to 2%.

The imminence of the potential harm at the time of the adverse employment decision, based on the medical testimony, indicated that seizures are not predictable and there is no specific means to determine when, or if, the plaintiff will experience another seizure or how many seizures are possible within a specific timeframe. Therefore, the risk is always present and the imminence of the potential harm is always present.

C. Suffered from an adverse employment decision.

Neither party disputes that the plaintiff suffered an adverse employment decision[11]. The only dispute at trial was the date of the adverse employment decision. The defendant argued that the date the plaintiff was notified that he would be remaining on a leave of absence should be considered the date of the adverse action. In support of that date, defendants presented the EEOC charge which referenced the January 27, 2012, decision. However, the EEOC charge also references the date of December 8, 2011, when the plaintiff was informed of the permanent restrictions.

The plaintiff argued that there was not a single adverse employment decision, but that the plaintiff was subject to continuing adverse employment decisions by failing to return the plaintiff to work. However, the plaintiff was aware on December 8, 2011, that the restrictions prohibited him from working as a carman. The following requests for reconsideration were all related to the imposition of those restrictions. There were not new or additional adverse employment decisions, but the single decision to place the plaintiff on permanent restrictions that prohibited him from performing the job of carman. Further, as stated above, the "continuing violation" doctrine is limited to claims of hostile work environment. The evidence demonstrated and the

---

[11] Plaintiff cites to *Dority v. City of Chicago*, 2001 WL 1155286 (N.D. Il. 2001) with regard to various employment actions deemed materially adverse. *Dority* is non-controlling precedent and neither party disputes that the plaintiff experienced an adverse employment action. Therefore, the Court did not consider *Dority* or the findings of the appeal in *Dority* (*Dority v. City of Chicago*, 50 Fed.Appx. 760 (7th Cir. 2002)) which is controlling precedent, but not relevant to the case at bar.

Court finds by a preponderance of the evidence that the adverse employment action occurred on December 8, 2011.

IV. **Conclusion.**

The Court finds it deplorable that the plaintiff was left suspended in employment purgatory. This was the plaintiff's livelihood and for years he continued to believe in good faith that he would be reinstated to his position of carman. By all accounts, Plaintiff was an excellent and dedicated worker for A&S and but for his medical condition, would still be a valued employee of the defendant. Because the plaintiff is still listed as an employee of the defendant, the Court encourages the defendant to assist the plaintiff with his participation in the defendant's Voc Rehab program to explore his options within or outside of A&S.

The Court finds that defendant Alton & Southern Railway Company carried its burden with regard to the direct threat defense at trial and based upon reasonable medical evidence, determined that the plaintiff was not qualified to safely perform the essential functions of a carman.

Therefore, the Court finds in favor of the defendant Alton & Southern Railway Company and against the plaintiff, Michael Reinacher. The Clerk of Court is **DIRECTED** to enter judgment for the defendant Alton & Southern Railway Company and against the plaintiff, Michael Reinacher. The Clerk of Court is also **DIRECTED** to terminate all pending motions as moot.

**IT IS SO ORDERED.**

DATED: 8/24/2016

                                                *s/J. Phil Gilbert*
                                                **J. PHIL GILBERT**
                                                **DISTRICT JUDGE**